# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**MARC D. OLIVER,**

    **Plaintiff,**

v.                                                            **CASE NO. 8:08-CV-1649-T-EAJ**

**MICHAEL J. ASTRUE,**
**Commissioner of Social**
**Security Administration,**

    **Defendant.**
_____ /

# FINAL ORDER

Plaintiff brings this action pursuant to the Social Security Act (the "Act"), as amended, Title 42, United States Code, Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for period of disability and Disability Insurance Benefits ("DIB"). The undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the administrative record, and the pleadings and memoranda submitted by the parties in this case.[1]

In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole and comports with applicable legal standards. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If there is substantial evidence to support the Commissioner's findings, this court may not decide the facts anew or substitute its judgment as to

---

[1] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge (Dkt. 12).

the weight of the evidence for that of the Commissioner. See Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979) (citations omitted).[2]

If the Commissioner committed an error of law, the case must be remanded to the Commissioner for application of the correct legal standard. See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then remand to the Commissioner for clarification is required. See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

## Background

Plaintiff filed his application for DIB on March 16, 2005, alleging a disability onset date of October 10, 2003. (T 14) Plaintiff's claims were denied initially and upon reconsideration. (Id.) Following an August 7, 2007 administrative hearing (T 425-93), the ALJ denied Plaintiff's application in a February 19, 2008 decision. (T 14-26) The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (T 5-7) Plaintiff filed a timely petition for judicial review of the Commissioner's denial after exhausting all administrative remedies (Dkt. 1). The Commissioner's decision is ripe for review under the Act.

At the time of the hearing, Plaintiff was fifty-seven (57) years old with a high school education and an associate of science degree in nursing. (T 25, 459) His past work experience included work as a registered nurse in the intensive care unit of a hospital. (T 25, 461)

To determine if Plaintiff was disabled, the ALJ performed a five step evaluation. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of

---

[2] Decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

disability on October 10, 2003, and that Plaintiff met the insured status requirements through December 31, 2009. (T 14, 16) Second, the ALJ determined that Plaintiff suffered from the severe impairments of obesity, status-post cytomegalovirus ("CMV") infection, possible fibromyalgia, hypertension, gastroesophageal reflux disease ("GERD"), chronic sinusitis, and renal artery stenosis and the non-severe impairments of affective and somatoform disorders. (T 16-17) However, these impairments, whether considered singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (T 19) Third, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of light work.[3] (T 20) Fourth, based on Plaintiff's RFC, the ALJ determined that Plaintiff was not capable of performing her past relevant work. (T 24) Relying on the testimony of vocational expert ("VE") Paul Dolan, the ALJ determined that Plaintiff could work as a unit clerk, medical assistant, medical records clerk, and a cardiac monitor technician. (T 26) Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. (Id.)

At the hearing, medical expert Edward Griffin, M.D. ("Dr. Griffin") testified as to Plaintiff's impairments based on his review of the medical evidence. (428-56)

The medical evidence has been summarized in the ALJ's decision and will not be repeated here except as necessary to address the issues presented.

## Discussion

Plaintiff alleges the Commissioner erred in: (1) failing to properly evaluate the opinions of

---

[3] The ALJ specifically found that Plaintiff was able to "lift/carry 20 pounds occasionally and 10 pounds frequently; sit/stand/walk for 6 hours in an 8 hour day. The claimant has been unable to climb ladders, ropes or scaffolds, and to work at unprotected heights or around dangerous machinery." (T 24)

3

Plaintiff's treating physicians; (2) failing to consider Plaintiff's medical condition as a whole; and (3) failing to properly evaluate Plaintiff's credibility (Dkt. 19).

I.      **Treating Physicians' Opinions**

Plaintiff submits that the ALJ improperly weighed the opinions of Plaintiff's treating internist Rick Damron, M.D. ("Dr. Damron") and treating psychotherapist Michael Zoda, Ph.D. ("Dr. Zoda") (Id. at 8).

The testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). Good cause exists where a physician's opinion is not bolstered by the evidence, the evidence supports a contradictory finding, or the opinion is conclusory or inconsistent with the physician's own medical records. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the nature and extent of the treatment relationship, medical evidence supporting the opinion, consistency with the record on the whole, and other factors. 20 C.F.R. § 404.1527(d).

    A.      **Dr. Damron**

Plaintiff contends that the ALJ improperly relied on the opinion of state agency physicians in rejecting Dr. Damron's July 24, 2005 statements on a physical RFC questionnaire that Plaintiff could not walk a block without rest, could tolerate only thirty minutes of continuous sitting, could not stand for any length of time, and would miss work three days out of every work week due to his impairments (Dkt. 19 at 8-9). (T 253-57) On the questionnaire, Dr. Damron diagnosed Plaintiff with fibromyalgia and chronic pain syndrome, among other things. The ALJ "did not attach much

4

weight" (T 21) to Dr. Damron's opinion but nevertheless found "possible fibromyalgia" as one of Plaintiff's severe impairments. (T 16)

"[A] treating physician's testimony can be particularly valuable in fibromyalgia cases, where objective evidence is often absent . . ." Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam). Due to "the unavailability of objective clinical tests, it is difficult to determine the severity of the condition and its impact on one's ability to work." Morrison v. Barnhart, 278 F.Supp.2d 1331, 1335 (M.D. Fla. 2003). The disease is "generally diagnosed mostly on an individual's described symptoms." Moore, 405 F.3d at 1212. The signs of fibromyalgia are primarily tender points on the body. Mackie v. Astrue, No. 1:07-CV-98-MP-WCS, 2008 WL 719210, at *9 (N.D. Fla. Mar. 11, 2008). "It is relevant to the weight of a treating physician's opinion that he or she have monitored the effectiveness of various therapies and found that they failed to provide any significant improvement." Id. (internal quotation marks and citation omitted).

Moreover, "[f]ibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." Id. (internal quotation marks and citation omitted). Nevertheless, the duty to resolve conflicts in the evidence rests with the ALJ. See, e.g., Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986) This is true even though the evidence may preponderate in favor of the claimant. Id.

The ALJ adequately articulated his justification for discounting Dr. Damron's opinion. See Moore, 405 F.3d at 1212 (finding ALJ adequately articulated reasons for discounting treating chiropractor's opinion that fibromyalgia claimant was disabled). Although to the ALJ, Dr. Damron's questionnaire responses were "based either on speculation or the [Plaintiff's] subjective allegations" (T 22-23), this was not why the ALJ rejected them. The ALJ also noted inconsistencies between Dr. Damron's RFC assessment on the one hand and Dr. Damron's treatment notes and

5

those of Plaintiff's other treating sources on the other. (T 21-24, see also T 195-201, 209-10, 302, 306-07, 339, 345-54)

Dr. Damron treated Plaintiff from December 2004 through October 2006. (T 195-201, 209-10, 253-57, 345-54, 364-68) The record contains treatment notes from approximately four of Plaintiff's office visits with Dr. Damron from 2005 through 2006 as well as Dr. Damron's discharge report of Plaintiff's November 30, 2004, through December 6, 2004 hospital stay for severe headaches and fever. (Id.) The physician's office visit notes do not contain detailed findings, however. In fact, it is unclear whether Dr. Damron ever performed a complete physical examination of Plaintiff; instead, Dr. Damron's records include hasty notations of Plaintiff's weight and blood pressure and lists of Plaintiff's medications. (See T 345-54) Dr. Damron's discharge report is no more illuminating. (T 195-98) On December 6, 2004, upon Plaintiff's hospital discharge, Dr. Damron wrote: "I am still at a loss as to what he has whether he has Lyme, Lyme type arthritis, Lyme type neuritis, neuropathy or whether he has just fibromyalgia."[4] (T 195-96)

Shortly thereafter, in January 2005, Plaintiff was admitted to the hospital on the advice of Richard Thacker, M.D. ("Dr. Thacker"), who was "covering" for Dr. Damron. (T 211) Dr. Thacker noted that Plaintiff "is well known to me." (Id.) Dr. Thacker's admission notes indicate that Plaintiff "has been told he has fibromyalgia but this [] certainly has not explained his constellation of symptoms." (Id.)

Despite this lack of detailed findings, in early July 2005, Dr. Damron completed a physical RFC form indicating that Plaintiff suffered from disabling fibromyalgia. (T 253-57) However, both Dr. Damron and Plaintiff doubted the fibromyalgia diagnosis as late as June 2005. On an

---

[4] Before Plaintiff was diagnosed with CMV, various medical professionals surmised that he may have contracted Lyme disease while fishing in New York. (T 318, 321)

"Established Patient Progress Note" completed during Plaintiff's June 8, 2005 office visit with Dr. Damron, Plaintiff stated that the reason for his visit was "? Fibromyalgia". (T 354) Further, there is no indication on Dr. Damron's own notes from that visit that he discussed fibromyalgia with Plaintiff. (T 353)

The ALJ nevertheless listed "possible fibromyalgia" as one of Plaintiff's severe impairments. Thus, by definition, Plaintiff's fibromyalgia significantly limits his physical or mental ability to do basic work activities. See Morrison, 278 F.Supp.2d at 1336 (citing 20 C.F.R. § 404.1520(c)). For clarification as to the severity of Plaintiff's fibromyalgia and its effect on his ability to work, the ALJ turned to the opinions of Plaintiff's two treating rheumatologists, who offered conflicting diagnoses.

Moreover, in December 2004, after examining Plaintiff extensively and reviewing his medical records, Mayo Clinic rheumatologist Kenneth Calamia, M.D. ("Dr. Calamia") reported that Plaintiff "could have fibromyalgia, but I do not think so." (T 339) Dr. Calamia saw Plaintiff for a return visit in February 2006 and did not change his findings. (T 306-07) Nevertheless, in January 2007, a different treating rheumatologist, Victor McMillan, M.D. ("Dr. McMillan"), opined that Plaintiff's symptoms "best fit into a fibromyalgia syndrome."[5] (T 387) Dr. McMillan reported that "[t]ender points are positive in 10 of 18 locations tested. Muscle strength appears to be good." (Id.) Notably, Dr. McMillan's treatment notes do not list any functional limitations due to Plaintiff's fibromyalgia; instead, they mainly recite Plaintiff's medical history. (T 386-87) Dr. McMillan recommended "heat and exercise" as alternatives to prescription medicine. (T 387)

---

[5] Progress notes from Plaintiff's visits to the Veterans Affairs Medical Center ("VAMC") reflect a diagnosis of fibromyalgia but it is unclear whether a VAMC physician rendered this diagnosis independently or whether the progress notes merely reflect Plaintiff's recitation of his impairments. (T 378, 398-99, 405, 410)

As the ALJ noted, infectious disease specialist Michael Keating, M.D. ("Michael Keating") of the Mayo Clinic evaluated Plaintiff in February 2005 and opined that Plaintiff suffered from "chronic fatigue state of uncertain etiology". (T 320) Mayo Clinic neurologist William Cheshire, M.D. ("Dr. Cheshire") examined Plaintiff in February 2006 and recorded his impressions as "[d]iffuse lower extremity myalgias of undetermined etiology. There have been no definitive signs of neuromuscular disease despite extensive evaluations here and elsewhere." (T 302) He continued: "I do not detect any weakness, atrophy, fasciculations, cramping, abnormality of muscle tone, or any signs of myelopathy." (Id.) Neither Dr. Keating nor Dr. Cheshire assessed any functional limitations due to Plaintiff's impairments (although both physicians recited Plaintiff's complaints that his physical activities were significantly limited). (T 302, 319) In fact, Dr. Cheshire reported that Plaintiff "has a normal stride and does not appear to have any muscle stiffness or spasticity. When asked to walk on formal examination, however, he walks more slowly and stiffly and is mildly unsteady." (T 302)

Faced with this lack of consensus among Plaintiff's treating physicians, the ALJ assigned little weight to Dr. Damron's questionnaire responses. (T 21) In addition to discussing Plaintiff's treatment history with Drs. Thacker, Calamia, Keating, and Cheshire, among others, the ALJ noted Plaintiff's daily activities, which included e-mailing, folding clothes, microwave cooking, grocery shopping with his wife, reading, and watching television. (T 21) The ALJ also emphasized that Plaintiff told VAMC personnel that he attended church up to three times a week and remained as active as possible. (T 370)

Given this evidence, the ALJ had good cause to discredit Dr. Damron's diagnosis of disabling fibromyalgia and to place greater weight on the evaluations of Plaintiff's other treating physicians. See Peters v. Astrue, 232 Fed. App'x 866, 872 (11th Cir. 2007) (per curiam)

(unpublished) (affirming ALJ's rejection of treating physicians' opinions that claimant was disabled because fibromyalgia treatment records were inconsistent with physicians' statements on other forms and claimant's daily activities). The ALJ's decision properly evaluated Dr. Damron's opinions.

### B. Dr. Zoda

Plaintiff next contends that the ALJ erred in discounting Dr. Zoda's September 2005 opinion as stated on a Treating Source Mental Health Report that Plaintiff was unable to work due to "extreme pain, confusion and inability to concentrate."[6] (T 344; Dkt. 19 at 9-10)

Dr. Zoda is a psychotherapist who treated Plaintiff approximately twenty times from April 2000 through May 2006. (See T 340-42) The ALJ "did not attach any significant weight" to Dr. Zoda's September 2005 opinion and specifically disregarded Dr. Zoda's statement that Plaintiff is unable to concentrate. (T 19)

As the ALJ noted, a consultative psychologist who examined Plaintiff in May 2005 concluded that Plaintiff suffered from only mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in concentration. (T 19, 236) The psychologist noted Plaintiff's complaints of a diminished ability to concentrate but determined that Plaintiff's above average cognitive functioning indicated only a moderate mental disorder. (T 238) A state agency psychologist again assessed Plaintiff in November 2005, concluding that Plaintiff had "variable attention/concentration" an "average" memory and suffered from minimal functional limitations from his mental impairments. (T 270) The ALJ pointed out that none of Plaintiff's treating physicians (other than Dr. Zoda) documented Plaintiff's difficulty concentrating. (T 19) The ALJ also emphasized Plaintiff's demeanor during the hearing: Plaintiff did not have difficulty

---

[6] In his most recent treatment note, Dr. Zoda concurred with his earlier finding that Plaintiff is "totally disabled." (T 340)

comprehending questions or providing answers and appeared to pay attention throughout the proceeding. (Id.; see T 421-93)

Substantial evidence supports the ALJ's treatment of Dr. Zoda's opinion. Other than the September 2005 report (to which Dr. Zoda did not attach any supporting treatment notes) and letters to Plaintiff's counsel and Plaintiff's insurance company, Dr. Zoda's treatment notes are not in the record. Moreover, Plaintiff did not report concentration difficulties to his VAMC mental health therapists, who noted on separate occasions that Plaintiff was able to understand problems and "verbalize possible solutions"(T 374), could make informed decisions regarding his treatment plan (id.), had "logical, coherent, goal directed" thought processes (T 373), and was "conversant and articulate." (T 370) Neurologist Richard Blackburn, M.D. ("Dr. Blackburn"), who examined Plaintiff in March 2004 upon the referral of one of Plaintiff's treating physicians, reported that Plaintiff was able to "follow complex commands without difficulty." (T 159) Moreover, Plaintiff testified to reading three to four mystery novels a month but that "sometimes I'll read a paragraph three or four times." (T 474, 478) Nevertheless, he stated he is "able to follow the story." (T 478)

Further, in a January 2005 psychological assessment, John Lucas, Ph.D. ("Dr. Lucas") of the Mayo Clinic observed that Plaintiff "often tended to lose his train of thought" (T 326) but that his memory was average for his age with "high average retention over time." (T 328) Dr. Lucas recommended that Plaintiff use "external memory aids" such as written notes, appointment calendars, and checklists, and did not assess any work-related restrictions. (Id.)

Thus, contrary to Plaintiff's argument, the ALJ did not reject Dr. Zoda's opinion based on the consultative psychologists' findings alone. Evidence from Plaintiff's other treating sources also provided the ALJ good cause to reject Dr. Zoda's opinion that Plaintiff's mental impairments are totally disabling. See Phillips, 357 F.3d at 1241.

## II. Subjective Complaints of Pain

Plaintiff also contends that the ALJ improperly discounted Plaintiff's complaints of pain and fatigue and was required to develop the record more fully regarding Plaintiff's mental limitations (Dkt. 19 at 13-14).

The Eleventh Circuit applies a three part "pain standard" when evaluating subjective complaints of pain. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Under this standard, the plaintiff must produce (1) evidence of an underlying medical condition, and either (2) objective medical evidence confirming the severity of the pain resulting from the medical condition, or (3) evidence that the condition is so severe that is can reasonably be expected to cause the alleged pain. Id.

Fibromyalgia can prove difficult to assess under the pain standard because its causes are unknown and its symptoms are almost entirely subjective. See Morrison, 278 F. Supp. 2d at 1335. An ALJ may rely on discrepancies between a claimant's complaints of disability and his testimony of daily activities to determine whether the complaints of fibromyalgia pain are credible. See Moore, 405 F.3d at 1212. A reviewing court will not disturb an ALJ's credibility finding if it is clearly articulated and supported by substantial evidence. Foote, 67 F.3d at 1562.

If the ALJ improperly discredited a plaintiff's subjective complaints, thus failing to adequately consider the effect of the plaintiff's impairments on his ability to work, the regulations require remand for reconsideration of the plaintiff's RFC. When evaluating subjective symptoms, the ALJ must consider: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side effects of medications; and (5) treatment or measures taken by the claimant for relief of symptoms. See 20 C.F.R. § 404.1529(c)(3)(I)-(iv).

In this case, the ALJ made specific reference to the pain standard. (T 20) In finding Plaintiff's statements not fully credible, the ALJ relied on discrepancies between Plaintiff's description of his daily activities and his complaints of pain. (T 21) These inconsistencies are supported by the record.

Plaintiff testified that he was unable to stand for more than three minutes and could sit for only thirty minutes. (T 464-65) Although Plaintiff testified that he could walk without his walker for short distances, he stated that he could not be on his feet for more than three minutes. (T 465) His chief complaint at many of his medical appointments was "I cannot walk." (T 332)

In discrediting Plaintiff's testimony, the ALJ emphasized that Plaintiff attended church activities three times every week. (T 21, 370) The ALJ also pointed out that Plaintiff's activities included grocery shopping with his wife, e-mailing his family, reading up to four novels per month, and folding clothes. (T 473-75) Plaintiff told his VAMC therapist that he was sexually active. (T 91) Moreover, the ALJ discredited Plaintiff's wife's testimony that Plaintiff is "almost like an Alzheimer's patient" (T 483) and that he would never be able to "get off of these meds." (T 484) None of Plaintiff's physicians concluded that Plaintiff would have to take his extensive list of medications indefinitely. (T 21) Further, there is nothing in the record comparing Plaintiff's cognitive abilities to those of an Alzheimer's patient. (Id.) Plaintiff does not challenge this credibility determination.

The ALJ also weighed Plaintiff's treating physicians' statements that Plaintiff's leg muscles were of average strength and had not atrophied. For example, in January 2005, Dr. Cheshire observed: "Tandem gait is normal. Heel-to-shin testing is normal. The only other abnormality is that the muscle tone through the lower extremities is greater than I would expect given his reported degree of physical conditioning". (T 333) Dr. Cheshire also noted that Plaintiff did not demonstrate

"weakness or fatigability, although the patient at times is reluctant to put forth effort complaining that he might fatigue. Furthermore, I cannot detect any distal weakness, atrophy, or sensory deficits . . ." (Id.) In February 2006, Dr. Cheshire again commented that "if [Plaintiff] had a myopathy sufficient to account for this magnitude of symptoms, I would have expected there to be some evidence of myopathy on electrophysiologic studies." (T 303) Dr. McMillan reported that Plaintiff's muscle strength was good as well.[7] (T 387)

Moreover, the ALJ elicited testimony from Plaintiff about the side effects of his medications, which at one point during the treatment history numbered approximately twenty-seven.[8] (T 470) The ALJ asked if Plaintiff thought some medications were causing his symptoms. (Id.) Plaintiff responded that the medicines cut his pain in half and "are helping my symptoms." (T 470) In February 2006, during an office visit to Dr. Rowland of Tandem Health Care, Plaintiff reported that he felt his pain was controlled on his "current routine." (T 272)

Regarding particular side effects, Plaintiff testified that his blood pressure medicine makes him urinate frequently and that Oxycontin causes constipation. (T 477-79) When Plaintiff's counsel

---

[7] The ALJ also discredited Plaintiff's testimony as to his use of a walker. The ALJ concluded that there was no medical evidence supporting Plaintiff's need for a walker and emphasized various notes from Plaintiff's treating sources, including Drs. Blackburn, Sampson, and Cheshire, as well as Plaintiff's VAMC therapist, indicating Plaintiff's gait was within normal limits. (T 21-22) Although Plaintiff testified that he also used the walker as a seat because "you never know where there's going to be a chair, or whether there's going to be a chair" (T 465), the ALJ's discussion of Plaintiff's use of a walker is not grounds for reversal as the credibility evaluation is based on other substantial evidence.

[8] Plaintiff submits that the ALJ improperly determined that Plaintiff should not take so much medication (Dkt. 19 at 13). This is in error, Plaintiff argues, because Plaintiff takes his medications as prescribed (Id.). Although the ALJ mentioned that he was not certain Plaintiff required all of his medications "even though it has been prescribed", he did not rely on this observation in considering Plaintiff's impairments. Moreover, Dr. Cheshire expressed concern over Plaintiff's medication regime as well. (T 333)

asked him if he has trouble concentrating due to his medications, Plaintiff stated: "I'm not sure, because I was having trouble concentrating on tasks before I started it, before I was on any medication, before I was on any pain medication, when I was only taking Tylenol." (T 479)

Relying on medical expert Dr. Griffin's testimony regarding the side effects of Plaintiff's medications, the ALJ formulated an RFC that restricted Plaintiff from climbing ropes, ladders, or scaffolds and from working at unprotected heights or around dangerous machinery.[9] (T 24, 443)

As there was substantial evidence to support the ALJ's credibility determination, Plaintiff's argument is without merit. See Allen v. Sullivan, 880 F.2d 1200, 1202-03 (11th Cir. 1989).

### III. Combination of Impairments

Finally, Plaintiff argues that the ALJ did not consider all of Plaintiff's medical conditions as a whole (Dkt. 19 at 11).

The ALJ must explain whether a claimant's impairments are severe singularly and in combination. Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986). The combined effect of a claimant's impairments must be considered even if any of the impairments considered separately are not "severe". Hudson v. Heckler, 755 F.2d 781, 785-86 (11th Cir. 1985). The failure to comply with these requirements results in a remand. Gibson, 779 F.2d at 623.

The ALJ's decision reflects that he considered all of Plaintiff's impairments that were supported by the medical evidence. The ALJ stated that Plaintiff had the severe impairments of obesity, CMV, possible fibromyalgia, hypertension, GERD, sinusitis, and renal artery stenosis and

---

[9] Dr. Griffin also testified that Plaintiff would have cognitive difficulties completing more than three-step commands due to the side effects from his pain medications, however. (T 448-49) The ALJ properly discredited this testimony because there was no documentation from any treating source addressing that limitation. (T 23) See Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984) (credibility determinations are the province of the ALJ).

14

the non-severe impairments of affective disorder and somatoform disorder. (T 17) The ALJ found that Plaintiff "does not have an impairment or <u>combination of impairments</u> that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (T 19) (emphasis added) This language has been held sufficient to discharge the Commissioner's obligation to consider the impairments in combination. See <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1224-25 (11th Cir. 2002) (ALJ's statement that claimant did not have a "combination of impairments" that constituted a severe impairment is evidence that the ALJ considered the combined effects of claimant's impairments).

Regarding Plaintiff's non-exertional limitations secondary to his fibromyalgia, the ALJ found Plaintiff's affective disorder and somatoform disorder to be non-severe. The ALJ properly rejected Dr. Zoda's opinion to the contrary (as stated above) but considered the impairments in formulating Plaintiff's RFC. (T 20) Thus, the ALJ properly considered Plaintiff's impairments as a whole and in combination. Plaintiff's argument on this issue is without merit.

## **Conclusion**

Substantial evidence supports the ALJ's findings that Plaintiff is not disabled under the Act. Accordingly and upon consideration, it is **ORDERED** that:

(1) the decision of the Commissioner is **AFFIRMED** and the case is **DISMISSED**, with each party to bear its own costs and expenses; and

(2) the Clerk of the Court shall enter final judgment in favor of Defendant consistent with 42 U.S.C. §§ 405(g) and 1383(c)(3).

**DONE AND ORDERED** in Tampa, Florida on this 23rd day of September, 2009.

/s/ Elizabeth S. Jenkins
ELIZABETH A JENKINS
United States Magistrate Judge